IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF ANGEL H. & VIVIAN H.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF ANGEL H. & VIVIAN H.,
CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

TINA H., APPELLANT.

Filed February 1, 2022.    No. A-21-535.

Appeal from the Separate Juvenile Court of Sarpy County: LAWRENCE D. GENDLER, Judge. Affirmed.

Lisa M. Gonzalez, of Johnson & Pekny, L.L.C., for appellant.

Sarah M. Moore, Deputy Sarpy County Attorney, for appellee.

MOORE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

INTRODUCTION

Tina H. appeals from the order of the separate juvenile court of Sarpy County terminating her parental rights to her children, Angel H. and Vivian H. We affirm.

BACKGROUND

PROCEDURAL BACKGROUND

Tina is the mother of Angel, born in 2007, and Vivian, born in 2012. Nick H. is the children's father. The State also sought to terminate Nick's parental rights to the children, and the record reflects that he planned to relinquish his parental rights. Because Nick is not part of this appeal, he will only be discussed as necessary. Tina and Nick also have an older child, Thu H., born in 2002. Thu was not part of these current juvenile proceedings, and because Thu is not part of this appeal, she will only be discussed as necessary.

The State filed a petition on August 22, 2019, later amended by interlineation on January 6, 2020, alleging that Angel and Vivian fell within Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because they were in a situation dangerous to life or limb or injurious to their health or morals "insofar as the mother, Tina H[.], is concerned." The State specifically alleged:

>      A. Vivian . . . has diabetes that is not being managed properly due to her mother's long absences from the home, and the mother's failure to follow proper medical procedures, despite multiple trainings on diabetes management. The mother's behavior places Angel at a serious risk of harm, including seizures, organ failure, and potentially death. The mother was referred to work with voluntary services through PromiseShip on or about July 12, 2019, and these efforts have not been successful. ~~The mother is verbally abusive to her daughters, and her daughters are fearful of her.~~
>
>      B. The minor children have been state wards on two prior occasions. Docket JV 08-206 from on or about March 13, 2008, until February 5, 2009, ~~due to domestic violence and the mother's absence from the home when at the gambling casino,~~ and again on Docket JV 15-116, from on or about February 26, 2015, until November 16, 2016. ~~due to the mother's neglect of the oldest child's mental health, verbal altercations in the home, and the mother's absence from the home due to her gambling.~~

The strikethroughs reflect the amendments by interlineation. Also on August 22, 2019, the juvenile court entered an ex parte order removing Angel and Vivian from the custody of their mother, and placing them in the custody of the Nebraska Department of Health and Human Services (DHHS). Tina was to have supervised parenting time. The children were placed in a kinship foster home, where they have remained.

In January 2020, Angel and Vivian were adjudicated as being within the meaning of § 43-247(3)(a) based on Tina's admission to the allegations in the petition, as amended. Tina was ordered to complete a mental status evaluation and a psychiatric evaluation.

Following a disposition hearing on February 5, 2020, the juvenile court entered its order on February 6. The court ordered Tina to cooperate with her attending psychiatrist, complete an individual diagnostic interview and follow the recommendations, complete a parenting class, cooperate fully with DHHS and the caseworker, maintain reasonable contact with her case manager and providers, maintain a suitable residence, seek and maintain gainful employment, participate in "individual/family counseling programs," participate in her children's medical appointments, and have supervised visitation rights. The court further ordered that Tina "shall have reasonable unsupervised visitation rights no later than 60 days from the date of the Order herein."

- 2 -

Following a review hearing in August 2020, the juvenile court ordered Tina to cooperate fully with DHHS and the caseworker, maintain reasonable contact with her case manager and providers, maintain a suitable residence, seek and maintain gainful employment, and participate in "individual/family counseling programs." The court further ordered that all medical information and physician appointments regarding the children be provided to Tina and her counsel. Following a review hearing in November, the matter was continued for further review hearings "under the terms and conditions previously ordered."

On November 24, 2020, the State filed a motion to terminate Tina's parental rights to Angel and Vivian pursuant to Neb. Rev. Stat. § 43-292(7) (Reissue 2016). The State alleged that the children had been in an out-of-home placement for 15 or more months of the most recent 22 months, Tina remained unfit to provide parental care for them, and that termination of Tina's parental rights was in the children's best interests.

TERMINATION HEARING

The hearing on the motion to terminate Tina's parental rights was held in May 2021, and an interpreter was present. The State called five witnesses to testify. Tina testified in her own behalf. Several exhibits were also received into evidence. A summary of the relevant evidence follows.

Certified copies of this family's two previous juvenile court cases were received into evidence. In March 2008, a juvenile petition was filed in Sarpy County Juvenile Court Docket JV 08-206, alleging that Thu and Angel fell within § 43-247(3)(a) because they lacked proper parental care insofar as their mother, Tina, was concerned; Vivian was not yet born. The petition alleged, as later amended:

> Domestic violence has been occurring in the home since on or before December 2003, and [Tina] has failed to seek services for herself or her husband. The mother, who works evenings from 3 p.m. to 11 p.m. sometimes goes to the casino after work. Currently, there are marital issues causing stress and discord in the family.

The juvenile court found those allegations to be true by a preponderance of the evidence and adjudicated the children accordingly. Services for Tina mentioned in the orders and docket entries included a safety plan and individual and family therapy. The children were removed from the home for approximately 1 week, but remained state wards for almost 1 year, at which time the case was successfully resolved and the court's jurisdiction terminated in February 2009.

In March 2015, a juvenile petition was filed in Sarpy County Juvenile Court Docket JV 15-116, alleging that Thu, Angel, and Vivian fell within § 43-247(3)(a) because they lacked proper parental care through the fault or habits of their mother, Tina. The petition alleged:

> A. On or about February 26, 2015, the minor children were removed from their mother's care after their father threatened self-harm, the mother was not available, and the oldest child presented very depressed with ideations of self-harm. Her mental health has been neglected by her mother, who often leaves her to care for her younger sibling for long periods of time, and spends family resources on gambling. She and the father of the minor children engage in verbal altercations when the children are at home, and are in the process of a divorce, although they currently reside in the same home.

B. There is a history of domestic violence in the home dating back to 2003, and prior court involvement due to domestic violence in the home in 2008 on Docket JV 08 - 206. Despite services on that docket, the children are in need of juvenile court involvement for their health, welfare, and safety.

The juvenile court found those allegations to be true by a preponderance of the evidence, except that it dismissed the portion of the allegation dealing with the process of divorce. The court adjudicated the children accordingly. Services for Tina mentioned in the orders and docket entries included an initial diagnostic interview, psychological evaluation, individual and family therapy, domestic violence programming, a family support worker, and visitation (supervised, semi-supervised, and unsupervised). The children were removed from Tina's home from February 2015 to May 2016. The case was successfully resolved and the court's jurisdiction terminated in November 2016.

Jamie D. testified that she is Angel and Vivian's foster mother. Jamie first met the children in February 2015, when she was their foster care placement in a previous juvenile case; in that case the children were in her home from February 2015 to May 2016. After the children returned to their mother in May, Jamie continued to provide daycare for the children 5 days a week. Jamie took Angel, 9 years old at the time, to urgent care in August 2016 while Tina was at work; urgent care ran some tests and said they believed that Angel was diabetic and to go to the emergency room at Children's Hospital immediately. Jamie took Angel from urgent care to Children's Hospital, and Tina arrived later. The hospital required training before Angel was able to go home. Jamie said, "[Tina] was at all of the same trainings that I was at, and additionally, they had more one-on-one training for her because she was still struggling to honestly accept the diagnosis, . . . and then still struggling to understand what needed to be done to care for [Angel]." According to Jamie, Tina was having a difficult time figuring out how to calculate carbs and insulin and how to administer the insulin. When asked if she was aware if Tina's training was provided to her in her native language Vietnamese, Jamie replied, "Yes, they had the Vietnamese translators as well." Jamie also stated that home health care services were offered in 2016, but Tina refused the services.

Jamie stated that after Angel was stabilized in August 2016, Tina asked that Angel stay with Jamie and her husband during the week when Tina was working, and then Tina had Angel on the weekends. As time went on, Jamie was still the one scheduling appointments, picking up prescriptions, and ordering supplies. Tina and Angel had to call Jamie "on a very regular basis to calculate numbers or figure out how much insulin to give," or what to do if Angel's blood sugar was high or low; Jamie had to do "quite a bit of coaching." Whenever Jamie "would push back" and try to put more responsibility on Tina, Tina would say she would find someone else to watch the girls. They reached a "breaking point" in December 2016, when Jamie would not do what Tina wanted her to do, and Tina got a new daycare provider. It concerned Jamie not to have Angel in her home for daycare, mainly because of "Angel's diabetes care, making sure that she was taken care of." Jamie stated that in March 2017, Tina called and asked if she would start watching the children again, and Jamie began watching them 5 days a week until they were placed in her home as foster children in the current case in August 2019; the only exception was that in the summer of 2019, the girls spent a lot of time with their older sister.

From 2016 to 2019, Jamie was also concerned about Vivian. Jamie stated that Tina "had a lot of issues" setting boundaries and figuring out how to get Vivian to do what she needed to do. "There was a lot of struggles with Vivian, getting her to do anything, getting her to get up in the morning. . . . They would have to call me and I would have to talk to Vivian"; Jamie would have to talk Vivian into getting dressed, and encourage her to get in the car and go to school. Jamie also stated that "Angel was still doing a lot of care, giving Vivian showers and doing her school paperwork and stuff like that."

Allyson Hoover testified that she was the family permanency specialist supervisor for this family from June to August 2019, when it was a voluntary, noncourt case. During that time, Angel and Vivian lived with Tina. When asked what concerns required her services, Hoover responded, "There had been multiple calls to the abuse and neglect hotline concerning Angel being hospitalized for diabetic ketoacidosis in May and in June of 2019"; "The report indicated that Angel was not receiving appropriate medical care and because of these hospitalizations was at risk for long-term health problems."

Hoover helped create a written voluntary safety plan wherein

Tina or Jamie D[.], who is the foster mother and was an informal support to the family at that time, would accompany Angel to her appointments on Mondays, an adult would send a picture of Angel's blood sugar meter and insulin pump every time that her sugar was checked to a group text, which included the case manager, Tina, Angel, Jamie, and the family support worker, and these numbers would be logged on a medical log or in a notebook that was provided.

Tina was to ensure that Angel was supervised when she was testing her blood sugars and programming her insulin pump to ensure that the proper amount of insulin was being administered to Angel. Tina received training from the Children's Physicians Endocrinology Clinic as well as home health services prior to and during Hoover's involvement; the home health training occurred during the voluntary services, and an interpreter was provided to Tina "during at a minimum the home health trainings." Home health care services also went to Tina's home several times per week to ensure that all of the equipment was functioning properly and to check the meter and follow up regarding whether the safety plan was being followed. Further, the family support worker's role was to reinforce what had been taught by home health services and assist with any other needs that would have been identified by the family.

During the summer 2019 voluntary case, Jamie continued to have concerns for Angel's diabetic care. Jamie said, "Angel told me that Tina was not the one filling out the form, that things weren't really different at home. . . . The only difference was Angel filled out the document and Tina would sign it before the person came to see them"; Tina "still was not getting up for the alarms overnight, checking blood sugars overnight, making sure that [Angel] was okay." Jamie said that Tina told her she was too tired with working to get up and do anything overnight. Jamie had "many conversations" with Tina about parenting. Jamie said, "There were a lot of times where [Tina] would call me, crying, she couldn't handle them anymore . . . she didn't know what to do, they don't listen to her." Tina "told me several times that it was too much for her, and a few times she's told me that she was going to give them up for adoption," but "it's going to be with someone they don't know."

Jamie knew that when the children were not in her care, Tina would leave them home alone. Jamie said, "Angel would call me or text me and tell me that [Tina] wasn't there and ask me what she should do if she was having a blood sugar issue[.]" Jamie would tell Angel to contact Tina, but when Angel would call or text Tina she would not answer. When asked if Angel was able to handle a diabetic crisis on her own, Jamie replied, "No." Jamie was also asked if the girls ever disclosed being left alone anywhere else. Jamie responded, "Angel told me that Tina would . . . take them to the casino with her and leave them in the lobby for long periods of time."

Hoover stated that Tina participated with and met with the workers, but there were no improvements. Hoover received verbal reports, emails, and provider reports from the family support worker as well as the doctor's office through Children's Endocrinology about Tina's handling of Angel's diabetes. Hoover said "we continued to receive reports that Angel's meter was not being logged at appropriate times or there were missing entries, and Angel continued to have concerning high and low blood sugars at her appointments." Hoover's "worker" attempted to help Tina understand the seriousness of Angel's disease. However, there were continued reports of concern for Angel's health, including an additional hospitalization. Hoover stated that "[a]fter consulting with the medical professionals and the family support worker, it was determined that it was no longer safe for the children to reside with their mother and an affidavit for removal was submitted to the County Attorney's Office."

The affidavit for removal authored by a family permanency specialist was received into evidence over Tina's hearsay and foundation objections. In the affidavit, the family permanency specialist stated that during the voluntary case, Angel's blood sugar meter readings continued to be high, and when home health staff asked Tina questions about Angel's diet and activity history for the past 3 days, Tina stated, "'Don't ask me questions!'" Additionally, Angel and Vivian informed the family permanency specialist that Tina "frequently threatens to cut out their tongues and isolate them from Jamie D[.] and their sister Thu H[.] if they say anything that makes Tina look like a bad parent to their case workers or doctors." The affidavit also stated:

> Vivian disclosed that her mother threatened to smash her tablet over her head for watching too much TV. Angel disclosed that Tina often screams profanities at the girls, in addition to statements such as, "You're a brat, you're a monster, why don't you just kill yourself? Why do you have this disease. . .? Go die, kill yourself, you're a dog, etc." Additionally, both Vivian and Angel disclosed to this affiant that they do not feel safe with their mother[.]

Angel reported to the family permanency specialist that Tina does not monitor her medical log or review the numbers, rather, she signs the medical log before case workers and medical professionals review it with her; there were numerous documented discrepancies between Angel's written medical log and the digital records pulled from her pump and meter. According to the Children's Hospital staff, Tina received multiple trainings on diabetes management in Vietnamese.

The children became state wards in August 2019. Hoover was once again assigned as a supervisor in this case from November 2019 until January or February 2021.

Hoover testified that an interpreter was present approximately 50 to 70 percent of the time that one of her workers communicated with Tina. On cross-examination, Hoover stated that it was reported to her that Tina was able to understand some English. According to Hoover, an interpreter was present for "all" of the safety planning, family team meetings, and for trainings. She later said

that if Tina requested an interpreter, "we ensured that all of the information was re-shared at a subsequent meeting where an interpreter was present." When asked when an interpreter was not present, Hoover responded, "For some of the drop-ins and the weekly face-to-faces that would have been required by the safety plan"; the family permanency specialist "has to have weekly face-to-face contact with the children to check on progress." Jamie testified that she has had conversations with Tina "[o]n almost a daily basis" since 2015. Their conversations have been in English; Jamie understood what Tina was saying to her, and she believed that Tina understood what Jamie was saying. Additionally, a docket entry dated October 2, 2008, in Sarpy County Juvenile Court case JV 08-206, stated, "[C]ounsel for [Tina] requested the Court proceed in the absence of an interpreter as she was able to understand the proceedings and the exhibits . . . . [Tina] also indicated a willingness to proceed in Court."

Ann Holstrom testified that she is a licensed mental health practitioner. She has provided therapeutic care to Angel and Vivian since April 2, 2020; they met weekly in the beginning, but at the time of the termination hearing they were meeting every other week.

Holstrom stated that Angel and Vivian were referred for therapy following their removal from Tina's care. Both children have been diagnosed with "adjustment disorder unspecified." Angel raised the concern that there was physical violence and emotional abuse in the home. Holstrom worked with Angel on developing her positive self-concept and positive body image, as well as coping skills to manage her anxiety. They have also used trauma focused cognitive behavioral therapy to create a trauma narrative and talk about circumstances Angel felt were traumatic, e.g., Tina hitting Angel with her hands and a charger cord, and Tina calling Angel an ugly child and disrespectful. Holstrom worked with Vivian on emotional regulation, learning how to manage her overwhelming feelings, how to express herself assertively, and how to ask for what she needs. Vivian also used trauma focused cognitive behavioral therapy to do a trauma narrative.

Holstrom met with Tina twice in June 2020 to prepare for family therapy. Holstrom talked to Tina about the issues that Angel and Vivian wanted to address in family therapy, specifically the trauma that they had experienced in Tina's home; Tina denied Angel's and Vivian's reports. At that time, Tina requested a different service provider. Holstrom and Tina resumed services in August, and met five times, the last time being on October 17. A "translator" was present at every session Holstrom had with Tina. Holstrom never met with Tina and the children together. Holstrom was unable to do family therapy because "Tina asked that we not address the issues that had happened in the past," "[s]he wanted to let the past be the past and forget it ever happened." Holstrom "tried to explain that her children could not do that because they were experiencing anxiety and distress and fear because of the things that had happened in the past, and it was important to them that they be able to talk to their mother about that to move forward." But Tina told Holstrom that she was close to her daughters, they never had any issues or problems, and that it was impossible that they would feel that way. At their last session, Holstrom told Tina that they could restart services if she was willing to address issues from the past. Holstrom spoke with Tina about the possibility of doing individual therapy, but Tina did not feel that was necessary. By October, Holstrom believed it would be helpful for Tina to have her own individual therapist because they failed to make progress with family therapy; however, Holstrom did not make that recommendation in her October 2020 or January 2021 letters to the case worker because she felt the focus was on family therapy and the children. In January 2021, Tina attempted to schedule

another family therapy session, but she was still not willing to address issues, so no session was scheduled.

Holstrom felt the children would not be "emotionally safe" during unsupervised visits. Holstrom said, "Angel had reported to me that during supervised visits, she and her mother argued frequently and her mother would frequently cry for long periods of time during those visits, and Angel and Vivian both reported that that made them uncomfortable." Holstrom worked with both girls on expressing themselves assertively with Tina. Vivian said that it was not safe for her and that she did not want to do that. In January 2021, Angel reported to Holstrom that she tried to talk to Tina during a supervised visit and it escalated into an argument that was very distressing for Angel. Holstrom and Angel worked on accepting the things that Tina was saying without becoming emotional, and using coping skills to stay calm during visits. Vivian continued to worry about living with Tina again. Holstrom believed that terminating Tina's parental rights was in the children's best interests because "[n]o significant progress has been made towards repairing the relationship between Angel and Vivian and their mother," "[t]hey've been removed from the home multiple times," "[t]hey've been out of the home for a significant amount of time, and it's in their best interests to have permanency."

Taylor Dibble-Townsend testified that she was the case manager for this family from March to November 2020. According to Dibble-Townsend, the COVID-19 pandemic hit the United States in early 2020, and all visits were moved to a virtual format in March. Accordingly, during Dibble-Townsend's time on the case, all of Tina's visits with the children were virtual because Angel's diabetes categorized her as high risk for COVID-19. The unsupervised visits previously ordered by the court in February, which were to occur within 60 days, never happened. In addition to the pandemic, Dibble-Townsend stated the girls started therapy in March, and "upon the therapist's recommendation from what the girls were reporting, we did not start unsupervised visits." Dibble-Townsend stated there were concerns with Tina "getting very emotional during the virtual visits as well as yelling at her children, but some of the visits went okay as well." Dibble-Townsend directed the visitation workers to end any virtual visits where Tina was yelling or extremely emotional and crying. Dibble-Townsend also explained to Tina that she needed to stay appropriate during visits and not yell at the children, and to let the visitation worker know if she needed to take a moment to be emotional before coming back to the visit. Tina never asked Dibble-Townsend for unsupervised visits. Tina did ask to have the children visit in her home, but that was not possible because of the pandemic and the recommendation of Angel's physician. According to Dibble-Townsend, other families that were already doing unsupervised visits when the COVID-19 pandemic started in March, were relegated to only doing virtual visits.

Dibble-Townsend stated that she met, or attempted to meet, Tina monthly, and spoke with Tina on the phone "probably weekly" and explained the court orders. There was also a family support worker and monthly family team meetings. Additionally, Dibble-Townsend helped Tina get services in place when needed. Tina completed an initial diagnostic interview, but no recommendations were given due to Tina's noncompliance during the interview, meaning that she gave "very minimal" answers and refused to answer some of the questions. Tina did not always cooperate in other matters as well. There were times when she did not attend the virtual doctor's appointment for Angel even though Dibble-Townsend had provided the link and the time. Tina did not attend court-ordered mediation. And Tina refused to meet with Dibble-Townsend in

October 2020; Dibble-Townsend said that, "[Tina] told me that she had nothing to say to me and that she only wanted to speak to the judge, so we did not meet that month." Dibble-Townsend met with the children individually every month, and both children reported on multiple occasions that they wanted to be adopted by their foster family and they felt safest with their foster family.

A DHHS court report and case plan authored by Dibble-Townsend and dated October 26, 2020, was received into evidence. According to Dibble-Townsend's court report, "Overall, progress towards reunification is poor." "Tina continues to have minimal contact with [Dibble-Townsend] and has been resistant to implementing any type of changes to her behaviors." Visits are reported to go okay, "however, [Tina] is sometimes known to speak badly of the foster parent or speak to her children about things that are not appropriate, like how she does not think the children should be in care"; "Tina refuses to meet with both Angel and Vivian at the same time, and is often reported to be yelling or crying during the visits." "Children's Hospital is able to monitor Angel's glucose levels remotely and have [sic] reported that her numbers have improved drastically since Angel was placed in her current foster home." Tina refused to tell Dibble-Townsend where she was employed.

As of November 2020, when her time on the case ended, Dibble-Townsend believed Tina was unfit because she "was resistant to implementing any of the court orders, any of the advice from the therapists, meeting with the family therapist," "she did not follow the rules for visitation and continued to yell and be very emotional on visits," she did not attend Angel's virtual diabetes appointments, and "the children expressed that they did not feel safe in her home." On cross-examination, Dibble-Townsend acknowledged that Tina had completed an initial diagnostic interview and a court ordered parenting class, was cooperating with family support, and that she had no issues contacting Tina. However, according to Dibble-Townsend, it is possible for someone to do an initial diagnostic interview and still not be cooperative, for example, the person refuses to answer questions or just gives very minimal answers. As noted earlier, Tina gave very minimal answers and refused to answer some of the questions during the interview.

Tamara Chiburis testified that she was the current case manager for this family, having been assigned as such in November 2020. As of Chiburis' March 2021 court report, Tina had not successfully participated in individual and family therapy, and she attended only two out of the four medical appointments for Angel since the COVID-19 pandemic began. Chiburis had difficulty finding a therapist that either spoke Vietnamese or would provide services with an interpreter. In March, Holstrom made Chiburis aware that there was a therapist in her office who was willing to work with Tina, individually, and with an interpreter. Chiburis said she did a referral for Tina in March, but Tina had not engaged in any individual therapy at the time of the termination hearing in May. Tina had been consistently exercising her 1-hour virtual visits on Sundays and Tuesdays, but some visits have had to be ended early. Tina stated that "just as recent as about a week ago," a visit was ended early by the visitation worker "after a redirection of Tina having inappropriate contact or bringing up subjects that are inappropriate during the visit." The concerns were that Tina had minimal visits and redirection was needed during visits "regarding specific subjects." Chiburis did not believe that Tina was a fit parent because "this is the third removal since 2008," Tina had not fully provided for the needs of her daughters, and she had not taken responsibility for why the girls were removed. Chiburis stated, "We are not closer to reunification than when we

started." Chiburis believed it was in the best interests of the children to terminate Tina's parental rights.

On cross-examination, Chiburis stated that she "touched base with Children's a couple months ago, and they gave a list of recommendations for Tina in order to successfully care for Angel, and that is to actively participate in all the medical appointments, to maintain her diabetes successfully, and have ongoing communication with Children's Hospital"; Chiburis did not have the list with her, "but [Children's] did provide an extensive list." According to Chiburis, Children's Hospital still encouraged the virtual visits for Angel's safety as she is at higher risk of COVID-19 due to her diabetes.

Chiburis' letter to the juvenile court dated March 9, 2021, was received into evidence; it included a court report addendum she had written. The report includes statements such as, Tina "has continued to be resistant to addressing anything about herself or taking accountability or responsibility for her actions and why the girls are not in her care," and "she is very adamant that she does not need any type of help or therapy."

Jamie testified that the children have been doing at-home learning since March 2019 because of the COVID-19 pandemic; this was recommended by Angel's medical providers. Also because of the pandemic, Tina and the children could no longer do in-person visits. As a result, Tina started coming to the foster home every Sunday to drop off homemade, authentic Vietnamese meals for the children; before the pandemic Tina used to cook for the children during their in-person visits on Sundays. According to Jamie, the children "love Tina's food." When she drops off the meals, Tina says hello and does not stay very long, because they have supervised video calls via Zoom every week. Jamie stated that the Zoom calls are an hour long, and Tina prefers to talk to the girls individually; there is also a visitation worker on the call to supervise, as well as a "translator." Jamie said that she would continue to allow Tina to bring meals to the girls, even if her parental rights are terminated.

Jamie stated that Tina never missed one of Angel's medical appointments prior to the COVID-19 pandemic, but that Tina has missed two of the four appointments since the pandemic started. Tina is always invited to medical appointments. Jamie schedules the appointments, and "as soon as I schedule them, I text her on a group chat with the translator . . . and then I also sent reminders and a link for the Zoom as it gets closer." Since Angel's diabetes diagnosis in 2016, Jamie has not seen a change in Tina's ability to provide for Angel's medical needs. Jamie said, "Even now, when Tina has an app on her phone that shows Angel's blood sugar, if she's high or low, she has never once called me to ask if we were treating or if she was okay or anything like that." Jamie was asked what would happen to Angel if her diabetes became out of control and no one took care of her. Jamie replied, "It can cause permanent damage to her organs, organ failure. She can go into diabetic ketoacidosis, seizures, a coma, and if it -- ultimately, she could die if she's not monitored correctly."

Jamie testified that the children do not want to go with Tina because they are worried about what it would be like at home. Angel is concerned that she will have the lone burden of her medical care and that she will be caring for Vivian. Jamie stated that "they're also concerned that their emotional needs are not going to be met when they're staying with their mother."

Tina testified via an interpreter. Prior to the girls being removed, she was doing a safety plan where she had to monitor Angel's diabetes and log readings; the parties stipulated this

occurred from July 9 to August 19, 2019. Tina said, "So, after every meal, at the end Angel had, then we'll read the machine on Angel and then we'll look at the number, we both would do, and then Angel would sign it and I signed it." "[I]f the number is low, lower than 80, 60, then I was to give Angel juice to drink and then check it again in 15 minutes[,]" and "[i]f it's a high number, like 400, then I was to call the hospital, speak to a nurse and she will give me instruction of what to do[.]" According to Tina, when Angel was with other people, the other people would not sign the log, so Tina did it later. Tina said, "[A]t the end, they just took my children[.]"

Tina acknowledged that Angel and Vivian had been removed on two other occasions, and both times they were successfully reunified. One of the services provided in those previous cases was family therapy. Tina believed that family therapy was beneficial for her and her children and that the "previous therapist was really good for us." According to Dibble-Townsend, Tina asked to see the previous therapist, but the previous therapist "was no longer a therapist." Regarding the current therapist, Tina said, "I can't work with her because she would make things up and causing me headache, huge headache[,] [s]o I -- I didn't want to see her anymore." Tina did not feel like the current therapist was willing to work with her.

Tina stated that she currently had visits with the children on Sundays and Mondays, not Sundays and Tuesdays. Tina said, "that lady earlier, she testify incorrectly. . . . That just showed that obviously she -- she has no clue. Now everybody would testify here, they all was giving -- telling lies. They reverse everything. Yes become no, no become yes." When asked if any of her case workers ever talked to her about why her visits could not be changed to unsupervised, Tina responded, "No one." Tina wanted to be able to visit her children in person, and would like things to progress; she said she kept asking, "but no case managers has [sic] offered to help me, and I finally give up. I don't know who to ask."

Tina said she attends Angel's medical appointments "[a]ll the time." Tina stated, "I always ask to inform me. There were two occasions that I would -- I was able to attend one time over the phone and one not too long ago, I could not get connected." "[W]hatever the Court ordered because of my children, I will comply, everything, but none of the case managers, workers, help me."

JUVENILE COURT'S ORDER

In an order entered on May 27, 2021, the juvenile court found that "the allegations of . . . the Motion for Termination of Parental Rights as to Section 43-292(1) are true, upon clear and convincing evidence." We note that § 43-292(7) (out of home for 15 or more months of the most recent 22 months), was the only statutory ground alleged in the motion to terminate Tina's parental rights; thus the court's reference to § 43-292(1) (abandonment), can be attributed to a scrivener's error. The court also found that termination of Tina's parental rights was in the children's best interests. Accordingly, the court terminated Tina's parental rights to Angel and Vivian. The court ordered that, pending appeal, Tina may continue to have contact with the children.

Tina appeals the juvenile court's order.

ASSIGNMENTS OF ERROR

Tina assigns, summarized and restated, that the juvenile court erred in finding by clear and convincing evidence (1) her parental rights should be terminated pursuant to § 43-292(1) and (7), and (2) termination of her parental rights was in the best interests of Angel and Vivian.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## ANALYSIS

In Nebraska, the grounds for terminating parental rights are codified in § 43-292. That statute contains 11 separate subsections, any one of which can serve as a basis for termination when coupled with evidence that termination is in the best interests of the child. *In re Interest of Mateo L. et al., supra*. It is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Mateo L. et al., supra*.

### STATUTORY GROUNDS FOR TERMINATION

We turn to the statutory basis alleged here. In its motion, the State sought to terminate Tina's parental rights under § 43-292(7). The juvenile court found that "the allegations of . . . the Motion for Termination of Parental Rights as to Section 43-292(1) are true, upon clear and convincing evidence." As noted previously, the court's reference to § 43-292(1) (abandonment), can be attributed to a scrivener's error. And our de novo review will be focused solely on § 43-292(7), as it was the only ground alleged by the State in the motion to terminate Tina's parental rights.

Tina asserts that the juvenile court erred when it found by clear and convincing evidence that § 43-292(7) supported termination of her parental rights. She argues the court "failed to acknowledge that the Covid-19 pandemic was the principle [sic] factor in the accumulation of time the . . . children spent outside of the home," and that that the court should have allowed time to "toll." Brief for appellant at 14.

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." By the plain and ordinary meaning of the language in § 43-292(7), there are no exceptions to the condition of 15 out of 22 months' out-of-home placement. *In re Interest of Mateo L. et al., supra*. Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al., supra*. In other words, if the 15-out-of-22 formula is met, § 43-292(7) is met. *In re Interest of Mateo L. et al., supra*.

In this case, Angel and Vivian were placed in kinship foster care on August 22, 2019, and they remained with foster parents through at least May 2021, when the trial ended. That period satisfies the 15-out-of-22 formula. There was clear and convincing evidence that § 43-292(7) existed as a statutory basis for termination of parental rights in this case. We next consider whether termination of Tina's parental rights is in the children's best interests.

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al., supra.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra.* The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.*

We have previously set forth the evidence presented at the termination hearing, and we will not recount it again here. Notably, Tina has had two previous juvenile cases in which her children have been removed from her care. In the 2015 case, one of the allegations was that Tina neglected her oldest child's mental health needs. Although both of the previous cases resulted in reunification and were successfully closed, Tina has now had her children removed from her care for a third time. This third removal follows a voluntary case in which attempts to work with Tina, specifically in regard to Angel's health needs, were unsuccessful.

Tina has been unable or unwilling to learn to manage Angel's diabetes. As far back as 2016, when Angel was diagnosed, Tina relied on Jamie to bear much of the responsibility for scheduling appointments, picking up prescriptions, ordering supplies, and calculating how much insulin to give or to tell her what to do if Angel's blood sugar was too high or too low. Tina received more training and support during the voluntary, noncourt case in the summer of 2019. But Tina was still unable or unwilling to do what was necessary. Tina would not get up overnight to check Angel's blood sugars because she was "too tired." And Tina relied on Angel to log her meter readings and would sign the logs right before they were checked. There were discrepancies in the written logs and digital records from Angel's meter, Angel continued to have concerning blood sugars, and she had an additional hospitalization. Even after Angel was removed from her home, Tina did not call to check on Angel when Angel's numbers were high or low, even though Tina had an app that gave her access to Angel's numbers. According to Jamie, if Angel's diabetes becomes out of control, "It can cause permanent damage to her organs, organ failure. She can go into diabetic ketoacidosis, seizures, a coma, and if it -- ultimately, she could die if she's not monitored correctly." During the COVID-19 pandemic, Tina missed two of the four virtual doctor's appointments on Zoom regarding Angel's diabetes, although it appears that in one instance, she may not have been let into the meeting by the moderator. The evidence at the termination hearing was that Angel's glucose levels have improved considerably since she was placed in her current foster home.

We acknowledge that the COVID-19 pandemic impacted Tina's visitation with Angel and Vivian. Pursuant to the juvenile court's February 2020 order, Tina was to have unsupervised visits within 60 days. However, according to Dibble-Townsend, when the pandemic hit the United States in early 2020, all visits were moved to a virtual format. This was true for other families as well, but was especially important for Angel because, according to Dibble-Townsend, "she was categorized as high risk" due to her diabetes. And, according to Chiburis, Children's Hospital still encouraged the virtual visits for Angel's safety as she is at higher risk of COVID-19 due to her diabetes. Although the order was for unsupervised visits, a supervisor was still present during the Zoom visits because Tina often yelled at the children or became overly emotional. Holstrom did not feel that the children would be "emotionally safe" during unsupervised visits. Several visits had to be ended early when Tina was inappropriate.

Tina also refused to address past issues with Angel and Vivian, or the girls' feelings of anxiety, distress, and fear, thus preventing the three of them from engaging in family therapy. Tina told Holstrom that she was close to her daughters, they never had any issues or problems, and that it was impossible that they would feel that way. The documentation from Dibble-Townsend and Chiburis reveals that Tina was resistant to addressing anything about herself, or taking accountability or responsibility for her actions and why the children are not in her care. Tina was adamant that she does not need any type of help or therapy.

Tina's testimony was that she was willing to do whatever was asked of her, but that no one would help her. She also claimed that everyone who testified was "telling lies."

Both Holstrom and Chiburis believed that it was in the best interests of the children to terminate Tina's parental rights because no significant progress has been made. Holston testified that the children deserve permanency. According to witness testimony and exhibits, neither Angel nor Vivian felt safe in their mother's home

The juvenile court found that it was in the best interests of Angel and Vivian that Tina's parental rights be terminated. We agree. Tina has had her children removed from her care on two previous occasions. In the current court case alone, filed in August 2019, the children had been out of Tina's home for more than 20 months at the time of the termination hearing. At the time of the termination hearing, Tina was still refusing to address the issues that needed to be addressed, as noted above. These children deserve permanency. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). And where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). We find that the State has rebutted the presumption of parental fitness as to Tina. We further find that there is clear and convincing evidence that it is in the children's best interests to terminate Tina's parental rights.

CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Tina's parental rights to Angel and Vivian.

AFFIRMED.